UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

VIBHAKER MOUDGIL,

                    Plaintiff,

- against -

FUJIFILM NORTH AMERICA, CORP.,

                    Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>COMPLAINT</u>

PLAINTIFF DEMANDS
<u>A TRIAL BY JURY</u>

       Plaintiff, Vibhaker Moudgil, by his attorneys, Vladeck, Raskin & Clark, P.C., complaining of FujiFilm North America Corp.. ("Fuji"), alleges as follows:

<u>NATURE OF CLAIMS</u>

       1.     Moudgil is a 58-year-old executive who has enjoyed a long and successful career. Despite Moudgil's excellent performance, Fuji refused to provide him with the title or compensation that matched his job duties. Fuji executives repeatedly made age-biased comments, stressing the need to hire younger employees. In addition to being one of the older employees in his group, Moudgil repeatedly raised concerns about Fuji engaging in unethical or illegal conduct, such as failing to pay taxes and using other companies' computer code without authorization. Shortly after one such complaint by Moudgil, Fuji fired him, along with three older employees.

       2.     Moudgil asserts claims for violations of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 623 <u>et seq.</u>; the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law § 290 <u>et seq.</u>; and the New York Labor Law § 190 <u>et</u> <u>seq</u>. (the "Labor Law"). Moudgil also asserts a claim for breach of contract and breach of the implied duty of good faith and fair dealing under New York common law.

## PARTIES

3. Moudgil resides in New York, New York. He was employed by Fuji from March 2015 until he was unlawfully discharged on April 16, 2018.

4. Fuji is a corporation that is organized and incorporated under the laws of New York and has a principal place of business in Valhalla, New York.

5. At all relevant times, Fuji was Moudgil's employer within the meaning of the ADEA, the NYSHRL, and the Labor Law.

## JURISDICTION & VENUE

6. The Court has original jurisdiction under 28 U.S.C. § 1331, as plaintiff's ADEA claim arises under federal law, and supplemental jurisdiction over plaintiff's NYSHRL, Labor Law, and common law claims under 28 U.S.C. § 1367.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant resides within the Southern District of New York.

## FACTUAL ALLEGATIONS

Background

8. Moudgil received his B.A. degree in 1985. He earned an Executive Master of Business Administration in 1998 and a Master of Science degree in Computer Science and Engineering in 2005.

9. Prior to joining Fuji, Moudgil worked in business for over two decades, managing employees, developing products, and drafting strategic plans. For example, from 2001 to 2010, he worked for Xerox, where he received several awards, including the designation of Lean Six Sigma Black Belt, which was bestowed on 3-5% of Xerox employees. Moudgil also was selected to the Lean Six Sigma Master Black Belt program. Fewer than 1% of Xerox employees were

selected for the Master Black Belt program.  While at Xerox, Moudgil oversaw projects that resulted in $20 million in savings in three years and launched a first-of-its kind software platform.

10. After Xerox, Moudgil worked in the IT department at the Internal Revenue Service as a member of the Senior Executive Service.

11. From 2009 to 2012 Moudgil was an adjunct professor at the University of Buffalo School of Management, teaching Purchasing and Global Supply Management.

Employment with Fuji

12. Moudgil began working for Fuji on March 8, 2015 as Director of Advanced Development..

13. Fuji offered Moudgil, in addition to his salary, a bonus of up to 25% of his salary if established metrics were met.

14. Moudgil was hired by Vice President of Software Solutions and Development Jim Dolce.

15. Initially, Moudgil reported to Dolce.

16. About three months after Moudgil started, Dolce assigned Moudgil additional responsibility and promoted Moudgil to Director of Software Development.  In that role, Moudgil was to manage all project managers and all software development managers responsible for the software development lifecycle.

17. About six months after Moudgil started, Dolce asked if he was interested in taking over Dolce's position running the Software Solutions and Development Department, reporting to General Manager Manny Almeida.  Almeida reported directly to the CEO of North America.  As Moudgil was replacing Dolce, who was a VP, Moudgil asked if he would be given the VP title.  Dolce told Moudgil that he should have the title, but it was Almeida's decision.

18. Dolce moved into a new position in business development.

19. Almeida asked Dolce to have Moudgil develop a strategic plan for the department, which Moudgil drafted. Almeida also instructed Moudgil to set up a one-on-one meeting between Moudgil and Almeida to discuss the plan. When Moudgil gave Almeida the strategic plan, Almeida gave Moudgil very positive feedback. Almeida also told a software development partner in Moudgil's presence that he was very happy that Moudgil was taking over the department.

20. After Moudgil had been reporting to Almeida for only a few weeks, Almeida told Moudgil that Almeida was moving to a new role and that Moudgil would report instead to VP and General Manager Bing Liem.

21. Moudgil asked Liem about being granted the VP title that matched his responsibilities. Liem said it was Almeida's decision. Almeida told Moudgil that Almeida agreed Moudgil's position was at the VP level, but did not follow through to change Moudgil's title.

22. The VP title would have entitled Moudgil to a raise of about $40,000 in his base salary, a bonus potential of 50% of salary, and a company car.

23. In or about March 2017, Liem moved into a different role and put VP Jim Rickert above Moudgil. Rickert is in his forties**.** Rickert had a background in marketing and had never managed a software team.

24. In or about June 2017, Rickert took away Moudgil's project management responsibilities, leaving him only with software development. Rickert made Steve Haak, who Moudgil had promoted into the position of Senior Project Manager, and Operation Manager Rob Scarzynski, both of whom had been reporting to Moudgil, his peers. Haak was in his late thirties/early forties and Scarzynski was about Moudgil's age. Rickert said that he would

communicate directions to their group through Haak. Thereafter, Rickert had very little contact with Moudgil or Scarzynski.

25. Throughout Moudgil's employment with Fuji, his performance was excellent, and he was awarded the maximum bonus of 25% of his base salary.

26. During Moudgil's employment with Fuji, he oversaw the development of software for photo kiosks at Walmart, as well as related mobile phone application development. In his last six to eight months at Fuji, Moudgil developed a strategy for the next generation artificial intelligence-based kiosk. Fuji sought to patent this concept. Walmart was very enthusiastic about the kiosks. Walmart also provided very positive feedback for Moudgil's approach for analyzing massively large data sets, which Walmart had requested from Fuji many times over the years. Moudgil was implementing the analysis when his employment was terminated.

Fuji's Youth Fixation

27. Throughout Moudgil's employment, Almeida and other executives made age-related comments.

28. For example, at a meeting held in connection with the annual Walmart strategy meeting, Almeida and other managers made comments about how the people they had in the meetings were too old. Those present were primarily in their forties and fifties.

29. At a monthly update meeting, Almeida made comments about Fuji needing younger people and said that they could not expect to generate new ideas that would be attractive to millennials with the age of the current workforce.

30. After Almeida and others made several such comments, Moudgil noticed that Fuji was hiring only employees in their twenties and thirties.

31. On a number of occasions, Moudgil was present when resumes of candidates were discussed by managers. If a resume arrived without a date for college graduation, the managers would not move that resume to the next stage, because they said they suspected that the applicant had omitted the date to cover up being older.

32. The age-focused comments by managers affected the culture at Fuji. Older employees tried to dress in youthful styles and some resorted to procedures such as Botox injections. When Moudgil asked one employee how Moudgil could thank her for her good work, the employee asked for a certificate for Botox injections. When Fuji hired young employees, employees would make jokes about the young employees being hired to replace the existing employees.

### Moudgil Raised Concerns About Unethical, Possibly Illegal, Conduct

33. Throughout Moudgil's employment with Fuji, Fuji had a code of conduct called the Standards of Business Conduct and Compliance with Law Program ("the Code"). The Code promised employees that they would not be "penalized or retaliated against in any manner" for reporting actual or suspected violations of the Code; Fuji policies, guidelines or procedures; or any applicable law, rule, or regulation.

34. In or about the fourth quarter of 2016, a software developer alerted Moudgil that Fuji was using code clearly marked as proprietary as source code to enable features within a certain Fuji product. As Fuji had terminated its relationship with the provider of the proprietary code, it had no right to incorporate the code into Fuji's product. Moudgil reported the issue to Liem, who advised Moudgil to report it to another Fuji executive. Moudgil was later told that Fuji had to pay approximately $100,000 to the company that had created the code.

35. In or about the third quarter of 2017, Moudgil discovered that Fuji software developers were using code that had not been licensed. He reported the issue to one of Fuji's attorneys and started the process of vetting the code. The Fuji attorney arranged for a training session for software developers in 2018. Moudgil had not completing vetting this issue before his employment was terminated.

36. In or about the third quarter of 2017, Moudgil realized that sales reports for an outside customer did not match Fuji's billings. Moudgil raised his concern to Rickert, as well as on a conference call with Fuji managers.

37. In or about the fourth quarter of 2017, during a status meeting Moudgil learned from Scarzynski that Fuji had not collected or paid New York sales tax for purchases made via the internet, despite Fuji's physical location in New York. Moudgil raised concern about this to Rickert and others in Fuji's New York headquarters. Scarzynski told Moudgil that the issue had been resolved. However, an employee who worked on the product for which taxes had not been paid told Moudgil that while Fuji was fixing the problem moving forward, it had no way of calculating the back taxes owed. Moudgil spoke with Rickert and Scarzynski to try to find out if the problem was actually fixed, but did not get clear answers.

Termination of Employment

38. On March 29, 2018, Dolce told Moudgil that, as part of reduction in force, his employment was terminated as of April 16, 2018.

39. Fuji's fiscal year ended March 31. Fuji did not pay Moudgil a bonus in 2018, even though he had met all the standards required to earn the bonus.

40. On April 2, 2018, Fuji sent Moudgil a severance agreement that included payment of his bonus, among other items, if he signed a release. The agreement referred to a bonus plan and said payment of the bonus would be subject to the terms and conditions of the plan.

41. As Moudgil did not have a copy of any bonus plan, and had not recalled ever seeing one, on May 23, 2018, he sent an email to the Senior Human Resources Manager who had sent him the severance agreement, asking for a copy of the plan. She replied, "We do not have a formal written document with the plan. It would be processed the same as last year and with the same criteria."

42. On June 1, 2018, Dolce sent Moudgil an email advising him that he would receive his bonus—which he had earned—only if he signed the agreement that waived his right to pursue claims for discrimination.

43. There were three other employees let go at the same time as Moudgil, all in their sixties. During Moudgil's employment, in prior layoffs most of the employees he knew were dismissed were in their fifties and sixties.

44. The employees who reported directly to Rickert who kept their jobs were in their forties.

FIRST CAUSE OF ACTION

Age Discrimination under the ADEA

45. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 44 of this Complaint as if set forth herein.

46. By the acts described above, defendant discriminated against plaintiff in the terms and conditions of his employment based on his age in violation of the ADEA.

47. Defendant's conduct was willful within the meaning of the ADEA, for defendant knew that its actions violated the ADEA and/or showed reckless disregard for plaintiff's statutorily protected rights under the ADEA.

48. Plaintiff has suffered and will continue to suffer irreparable injury and other compensable damage as a result of defendant's willful and unlawful conduct unless and until this Court grants relief.

## SECOND CAUSE OF ACTION

### Age Discrimination under the NYSHRL

49. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 48 of this Complaint as if set forth herein.

50. By the acts described above, defendant discriminated against plaintiff in the terms and conditions of his employment based on his age in violation of the NYSHRL.

51. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### Violation of New York Labor Law

52. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 51 of this Complaint as if set forth herein.

53. By the acts described above, defendant made an unlawful deduction of plaintiff's earned wages, in violation of New York Labor Law § 193. Defendant's violation was not in good faith.

## FOURTH CAUSE OF ACTION

### Breach of Contract

54. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 53 of this Complaint as if set forth herein.

55. By the acts described above, including terminating Moudgil's employment because he raised concerns about improper conduct, defendant breached the promises it made in the Code.

56. As a result of defendant's acts, plaintiff has suffered and will continue to suffer irreparable injury, and other compensable damage unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

### Breach of the Duty of Good Faith and Fair Dealing

57. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 56 of this Complaint as if set forth herein.

58. In the event that defendant claims that plaintiff was not owed a bonus because he was not employed on the date bonuses were paid, defendant violated its obligation of good faith and fair dealing by terminating Moudgil's employment just prior to the payment of bonuses.

59. As a result of defendant's acts, Plaintiff has suffered and will continue to suffer irreparable injury, and other compensable damage unless and until this Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the ADEA, the NYSHRL, the Labor Law, and New York common law;

(b) enjoining and permanently restraining these violations of the ADEA, the NYSHRL, the Labor Law, and New York common law;

(c) directing defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position he would have occupied but for defendant's treatment of him, and making him whole for all earnings and other benefits he would have received but for defendant's treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e) directing defendant to pay plaintiff liquidated damages for its violation of the ADEA and the Labor Law;

(f) directing defendant to pay plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(g) awarding plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(i) awarding plaintiff the costs of this action, together with reasonable attorneys' fees; and

(j) awarding such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury in this action.

Dated: New York, New York
June 19, 2020

        VLADECK, RASKIN & CLARK, P.C.

By:   */s/ Anne L. Clark*
    Anne L. Clark
    Yannick A. Grant
    Vladeck, Raskin & Clark P.C.
    Attorneys for Plaintiff
    565 Fifth Avenue, 9th Floor
    New York, New York  10017
    (212) 403-7300